# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

R.C., by his Natural Mother, S.P.,

      *Plaintiff/Judgment-Creditor,*

 vs.

J.C.,

      *Defendant/Judgment-Debtor,*

and

TRAVELERS PERSONAL INSURANCE
COMPANY,

      *Garnishee.*

Case No. 23-2346-EFM-GEB

## MEMORANDUM AND ORDER

Before the Court are cross motions for summary judgment: Plaintiff R.C.'s Motion for Summary Judgement (Doc. 25) and Garnishee Travelers Personal Insurance Company's ("Travelers") Motion for Summary Judgment (Doc. 27). Both parties seek declaratory judgment regarding whether the insurance policy provided coverage for the claims that J.C. negligently supervised R.C.'s stepbrother which allegedly resulted in R.C.'s sexual and physical abuse. R.C. asserts that the insurance policy does provide coverage. Whereas Travelers contends that the insurance policy does not provide coverage, and thus, it is not subject to garnishment. R.C. also

requests oral argument. The Court has thoroughly reviewed the record and applicable law. For the reasons stated below, the Court denies R.C.'s Motion and grants Travelers' Motion.

## I.     Factual and Procedural Background[1]

R.C. is a minor child with medical conditions that require 24-hour care. His parents, J.C. and S.P., divorced in April 2015 when R.C. was three years old. After the divorce, J.C. and S.P. shared joint custody of R.C. and had equal rights to parenting responsibilities. J.C. claimed R.C. as a dependent for tax purposes on even numbered years and S.P. claimed R.C. as a dependent for tax purposes on odd numbered years. However, J.C. was financially responsible for the majority of R.C.'s health insurance and medical expenses.

Each parent was entitled to two weeks of continuous vacation time with R.C. during the summer. R.C. rotated or shared major holidays between J.C. and S.P. Also, R.C. stayed every weekend at J.C.'s house until October 4, 2019. Thereafter, R.C. stayed every other weekend at J.C.'s house with biweekly dinner visitations on Wednesdays. When R.C. stayed at J.C.'s house he shared a room and a bunk bed with his stepbrother. The stepbrother allegedly sexually and physically abused R.C. from August 2019 to March 2020.

From July 25, 2019, to July 25, 2020, J.C. obtained a Homeowners Policy from Travelers. J.C. is the named insured in the Policy. As defined in the insurance policy, the use of "you" and "your" refers to J.C. as the named insured and J.C.'s spouse if a resident of the same household. The insurance policy also defined insured to include "[y]ou and residents of your household, who

---

[1] The facts are uncontroverted by the parties unless otherwise noted.

are: (1) Your relatives; or (2) Other persons under the age of 21 and in the care of any person named above."[2]

Under Liability Coverage E—Personal Liability—Bodily Injury and Property Damage ("Liability Coverage E"), the insurance policy included coverage for claims or suits brought against an insured for bodily injuries or property damages with a coverage limit of $300,000. The insurance policy defined bodily injury as "bodily harm, sickness or disease, including required care, loss of service and death that results."[3] However, the insurance policy excluded coverage for "[b]odily injury to you or an insured" under Liability Coverage E.[4]

The insurance policy, under Liability Coverage F—Medical Payments to Others ("Liability Coverage F"), included coverage for medical expenses incurred from the bodily injury with a limit of $2,000. Liability Coverage F also excluded coverage to "you or regular residents of your household except 'residence employees.'"

On July 2, 2021, Travelers was notified by letter and telephone of R.C.'s claims against J.C. The asserted claims were that J.C. negligently supervised the stepbrother resulting in the sexual and physical abuse of R.C. from August 2019 to March 2020. Travelers began investigating the claim under a complete reservation of rights.

Travelers emailed J.C. on September 23, 2021, to request additional information and documentation. Travelers did not receive the requested materials or a response from J.C.

On March 7, 2022, Travelers contacted J.C. again to request the additional information and documentation that it initially requested in September. Travelers stated that it would not be able to

---

[2] Ex. G to Joint Statement of Uncontroverted Material Facts (Doc. 24-7).

[3] *Id.*

[4] *Id.*

complete its coverage investigation without the requested information and warned J.C. that if it did not hear back directly from him in the next 30 days, it would close the case against him.

On April 27, 2022, Travelers issued a coverage denial letter to J.C., concluding that R.C., J.C., and the stepbrother each qualified as an insured, and thus, were excluded from the insurance policy's coverage.

After J.C. received notice of Travelers' denial of coverage, he entered into an agreement with R.C. and S.P. to arbitrate and protect his assets. The arbitration was held on March 7, 2023. The arbitrator found that J.C. was negligent and awarded R.C. $5,150,000 for all his damages and injuries.

R.C. then brought claims against Travelers for garnishment in a Kansas state court. Travelers removed the case to federal court under the Court's diversity jurisdiction. The parties agreed in the Phase I Scheduling Order that early cross-motions for summary judgment regarding insurance coverage are the best way to efficiently resolve the case. On January 22, 2024, R.C. and Travelers filed their Motions for Summary Judgment. Each Response was filed on February 12, 2024, and the Replies were filed on February 26, 2024.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[5] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[6] The movant bears

---

[5] Fed. R. Civ. P. 56(a).

[6] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

the initial burden of proof and must show the lack of evidence on an essential element of the claim.[7] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[8] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[9] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[10]

The Court applies this same standard to cross motions for summary judgment. Each party bears the burden of establishing that no genuine issue of material fact exists and entitlement to judgment as a matter of law.[11] "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[12] But where the cross motions overlap, the Court may permissibly address the legal arguments together.[13] Each motion is viewed in the light most favorable to its nonmoving party.[14]

### III.    Analysis

Both parties seek declaratory judgment regarding whether the insurance policy covers the claims that J.C. negligently supervised the son stepbrother, which allegedly resulted in R.C.'s sexual and physical abuse. The insurance policy excludes coverage for "bodily injury" to J.C. or an "insured." Under the insurance policy an insured is defined as: "You and residents of your

---

[7] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[9] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[10] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[11] *See. Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[12] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citation omitted).

[13] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

[14] *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

household, who are: (1) Your relatives; or (2) Other persons under the age of 21 and in the care of any person named above."[15] There is no dispute that R.C. was related to J.C., and thus, the focus of the parties' arguments is the definition of "resident." Specifically, the parties' motions for summary judgment present the following issues: (1) whether the term "resident" within the insurance policy is ambiguous and (2) whether R.C. is considered a resident of J.C.'s household under the insurance policy.[16] The Court will consider each issue in turn.

**A.      The insurance policy's use of the word "resident" is ambiguous.**

R.C. asserts that the insurance policy's use of the word "resident" is ambiguous because Travelers failed to define "resident" and utilized a conflicting undefined term, "regular resident." Thus, R.C. argues "resident" and "regular resident" must have different meanings. Travelers argues that the term "resident" is unambiguous because Kansas courts have determined that the terms "residence," "resident," and "primarily a resident" are not ambiguous.

Under Kansas law, the terms of an insurance policy are to be construed according to the following rules of construction:

> The language of an insurance policy, like any other contract, must, if possible, be construed in such way as to give effect to the intention of the parties. In construing a policy of insurance, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished.
>
> Because the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage under the policy, it must use

---

[15] Ex. G to Joint Statement of Uncontroverted Material Facts (Doc. 24-7).

[16] Plaintiff appears to assert a breach of contract claim under a theory that Travelers failed to act in good faith and with reasonable care when it evaluated J.C.'s insurance claim. This is raised for the first time in Plaintiff's briefing for his summary judgment motion. A motion for summary judgment is not the appropriate vehicle to raise a new claim. *Jones v. Kansas*, 2013 WL 4482710, *7 (D. Kan. Aug. 21, 2013).  Further, a breach of contract claim is not the case before the Court. The only issue before the Court is whether Travelers' insurance policy provides coverage for J.C.'s claims. Thus, the Court will not address Plaintiff's newly asserted breach of contract claim.

clear and unambiguous language; otherwise, the policy will be liberally construed in favor of the insured. If an insurance policy's language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. In such case there is no need for judicial interpretation or the application of rules of liberal construction. The court shall not make another contract for the parties and must enforce the contract as made.

However, where the terms of an insurance policy are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail.

To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning.

Whether a written instrument is ambiguous is a question of law to be decided by the courts. Courts should not strain to create an ambiguity where, in common sense, there is not one. The test in determining whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean.[17]

Kansas state courts utilized these rules of construction when determining whether the terms "resident," residence," and "primarily a resident" are ambiguous.[18] In *Friedman v. Alliance Ins. Co., Inc.*,[19] the Kansas Supreme Court considered the term "residence" when deciding if a child was a resident of his parents' household.[20] The Kansas Supreme Court did not find the term "residence" to be ambiguous; however, it held that determining whether a child is a resident of a household "must be done on a case-by-case basis."[21] The *Friedman* Court created a list of nine

---

[17] *Am. Fam. Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1058–59, 179 P.3d 1104, 1109–10 (2008) (citing *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 575–76, 56 P.3d 789 (2002)).

[18] *Briggs v. State Farm Mut. Auto. Ins. Co.*, 526 F. Supp. 3d 962, 967 (D. Kan. 2021).

[19] 240 Kan. 229, 729 P.2d 1160, 1165–66 (1986).

[20] *Id*. at 1166.

[21] *Id*. (utilizing a nine-factor test to determine whether a child is a resident of a household).

nonexclusive factors to be considered in determining whether a child is a resident of the parents' household.[22]

In *Hall v. Shelter Mutual Insurance*,[23] the Kansas Court of Appeals considered if a child was "primarily a resident" of her father's or mother's household under an insurance policy.[24] The Kansas Court of Appeals determined that the term "primarily a resident" was not ambiguous.[25] Further, the *Hall* Court declined to apply the *Friedman* factors because the evidence was clear that the child was *primarily* a resident of her mother's household.[26]

The Kansas Court of Appeals also addressed the term "resident of the same household" in *Teter v. Corley*.[27] The issue in *Teter* was whether a son was a "resident of the same household" as his father.[28] The *Teter* Court utilized a two-factor test to determine whether the son established a residence in his father's household.[29] The Kansas Court of Appeals determined the son was not a "resident of the same household" as his father because there was ample evidence that the son was only temporarily present at the father's home.[30]

---

[22] *Id.*

[23] 45 Kan.App.2d 797, 253 P.3d 377, 381–82 (2011).

[24] *Id.*

[25] *Id.* (determining that the term was not ambiguous despite the argument that the policy also provides coverage for a child away at college and/or a foster child because the claim was limited to underinsured motorist benefits not the comprehensive insurance policy).

[26] *Id.* (emphasis added).

[27] 2 Kan.App.2d 540, 584 P.2d 651 (1978).

[28] *Id.* at 652.

[29] *Id.* at 653 (quoting *Estate of Schoof v. Schoof*, 193 Kan. 611, 396 P.2d 329 (1964) (utilizing two factors— bodily presence and intent—which are included in the factors propounded by the *Friedman* Court).

[30] *Id.* at 655.

Further, this Court, in *Briggs v. State Farm Mutual Automobile Insurance*,[31] considered whether the terms "resident" and "resides primarily with" were ambiguous when determining whether the plaintiff was a "resident relative" under the insurance policy.[32] This Court determined that those terms were not ambiguous because Kansas state courts had already examined the meaning of the terms "resident" and "primarily a resident" and held that they are not ambiguous.[33]

Here, the term at issue is "resident." Travelers uses this term to define who qualifies as an "insured" under its insurance policy; however, it does not provide a definition for the term "resident." The Court agrees with Travelers that by itself the meaning of "resident" is clear and unambiguous under Kansas law. However, the Court considers the insurance policy *as a whole* when determining whether a term is ambiguous. It is important to note that the insurance policy liability coverage section includes the term "regular residents" in addition to the term "insured." Travelers intentionally used the specific term "regular residents" without providing a definition. Additionally, Kansas courts have not evaluated the term "regular residents." Travelers' use of the term "regular residents" while also using the term "resident" in the insurance policy confuses what the parties intended for "resident" to mean.

Due to the lack of definitions for these terms, it is unclear who would qualify as a "regular resident" and who would qualify as a "resident." Both terms invoke broad interpretations and neither term explicitly limits coverage. Thus, reading the insurance policy as a whole sheds doubt on the definition of "resident." As a result, the Court determines that the insurance policy's use of

---

[31] 526 F. Supp. 3d 962 (D. Kan. 2021).

[32] *Id*. at 967 (analyzing the terms under Kansas law).

[33] *Id*.

the term "resident" is ambiguous. Accordingly, the Court will liberally construe the insurance policy in favor of J.C. as it evaluates whether R.C. is considered a "resident" of J.C.'s household.

**B.      R.C. is considered a resident of J.C.'s household under the insurance policy.**

R.C. argues that he was not a resident of J.C.'s household at the time the abuse occurred, and thus, the insurance policy exclusion does not apply to him. In contrast, Travelers asserts that the insurance policy exclusion does apply to R.C. because he was a resident of J.C.'s household at the time the alleged abuse occurred. Determining whether a child is a resident of a household "must be done on a case-by-case basis."[34] Kansas state courts developed factors to determine whether a child is a resident of a household.[35] The *Friedman* Court propounded the following non-exclusive list of factors: (1) the child's intent; (2) the child's bodily presence in the home; (3) whether there exists a second place of lodging, a second address, and if so, the relative permanence or transient nature thereof; (4) the child's relationship with the parents; (5) whether the child has a key to the home, his or her own room, and personal belongings there; (6) whether the child is self-supporting; (7) whether a new residence has been established; (8) where the child votes, gets mail, pays taxes, registers vehicles, banks, and has permanent ties; and (9) the length of time the child has actually resided in the home and the permanency of the living arrangements.[36] Additionally, Kansas state courts have indicated that a child may maintain residency in multiple households, but may only be a primary resident of one household.[37]

---

[34] *Friedman*, 729 P.2d at 1166.

[35] *Briggs*, 526 F.Supp.3d at 967–68.

[36] *Friedman*, 729 P.2d at 1166.

[37] *Hall*, 253 P.3d at 382.

Here, J.C. shares custody over R.C. with S.P. Thus, the Court will address the *Friedman* factors to determine whether R.C. is a resident of J.C.'s household.

### 1.    The child's intent

The first *Friedman* factor is the child's intent.[38] Residence requires the "intent to remain there either permanently or for an indefinite period."[39] R.C. argues that his intent was to be a resident of his mother's home. He further asserts that he believed that he lived with his mother and that he wanted nothing to do with J.C. However, Travelers argues that these statements are not evidence of R.C.'s intent. The Court is inclined to agree. The evidence R.C. presents is the arbitrator's statements from nearly two years after the alleged abuse took place. They are not indicative of R.C.'s intent at the time the incident occurred. Because R.C. fails to provide sufficient evidence of his intent for the relevant time period, the Court finds this factor neither weighs in favor of or against R.C. being a resident of J.C.'s household. Therefore, this factor is neutral to the Court's analysis.

### 2.    The child's bodily presence in the home

Under the second *Friedman* factor, the Court looks to the child's presence in the home.[40] J.C. and S.P. shared joint custody. Each parent was entitled to two weeks of continuous vacation time with R.C. during the summer. R.C. rotated or shared major holidays between J.C. and S.P. Also, R.C. stayed every weekend at J.C.'s house until October 4, 2019. Thereafter, R.C. stayed every other weekend at J.C.'s house with biweekly dinner visitations on Wednesdays. R.C. argues that this factor weighs against residency because he lived with his mother on a regular and

---

[38] *Friedman*, 729 P.2d at 1166.

[39] *Teter*, 584 P.2d at 654.

[40] *Friedman*, 729 P.2d at 1166.

permanent basis. The Court finds this argument unpersuasive. While R.C. residing with his mother on a more regular basis may weigh against R.C. having a *primary* residence in J.C.'s household, it does not weigh against R.C. being a resident in J.C.'s house. A child may be a resident of multiple households.[41] Therefore, the second *Friedman* factor weighs in favor of R.C. being a resident of J.C.'s household at the time the incident at issue occurred.

3.    *Whether there exists a second place of lodging, a second address, and if so, the relative permanence or transient nature thereof*

The third *Friedman* factor looks to whether R.C. had a second place of lodging, a second address, and if so the relative permanence or transient nature thereof.[42] As explained above, J.C. and S.P. shared joint custody. Thus, two places of lodging existed for R.C. While R.C. argues that R.C.'s visits with J.C. were occasional, this is unsupported by the record. R.C.'s residence in both J.C. and S.P.'s homes was relatively permanent. The parenting plan determined when R.C. would reside with each parent. Although R.C. would *primarily* reside with S.P. during the relevant time period, R.C. resided with both S.P. and J.C. Because a child may have multiple residences,[43] the Court finds this factor weighs in favor of R.C. being a resident of J.C.'s household.

4.    *The child's relationship with the parents*

Under the fourth *Friedman* factor, the Court examines the child's relationship with the parents.[44] Under the joint custody agreement, J.C. had equal parenting responsibilities over R.C. However, J.C. was financially responsible for the majority of R.C.'s health insurance and medical

---

[41] *Hall*, 253 P.3d at 382.

[42] *Friedman*, 729 P.2d at 1166.

[43] *Hall*, 253 P.3d at 382.

[44] *Friedman*, 729 P.2d at 1166.

expenses. Additionally, on even numbered years, J.C. claimed R.C. as a dependent for tax purposes. On odd numbered years, S.P. claimed R.C. as a dependent for tax purposes.

R.C. argues that this factor weighs against being a resident of J.C.'s household for the same reasons addressed in the first *Friedman* factor. However, as the Court noted above, the statements R.C. relies upon are not indicative of the relevant time period, and they are not his own statements. It is clear that R.C. had a relationship with both J.C. and S.P. during the relevant time period. Therefore, the Court finds that the fourth factor weighs in favor of R.C. being a resident of J.C.'s household.

> 5.     *Whether the child has a key to the home, his or her own room, and personal belongings there*

The Court considers whether R.C. had a key to J.C.'s home, his own room, and personal belongings there under the fifth *Friedman* factor.[45] The only evidence the parties provide is that R.C. shared a room and a bunk bed with his stepbrother. R.C. argues that this factor weighs against residency because he did not have his own room. In contrast, Travelers argues that J.C. maintained a bunk bed for R.C.'s use, which is indicative of R.C.'s status as a resident instead of a transient visitor. The Court is unpersuaded by R.C.'s arguments. This factor does not require R.C. to have his own *private* room. Rather, it is enough that R.C. had a designated room and a bed to sleep in when he stayed at J.C.'s house. There is no evidence that R.C. slept on the couch or frequently changed his sleeping arrangements at J.C.'s home. Therefore, the Court finds that R.C. had his own room at J.C.'s house.  As a result, the Court finds that this factor weighs in favor of R.C. being a resident of J.C.'s household.

---

[45] *Id.*

### 6. Whether the child is self-supporting

The sixth *Friedman* factor is whether the child is self-supporting. A child who is self-supporting is more likely to not be considered a resident of his parents' household.[46] Here, however, R.C. was a young child at the time of the incident at issue. The parties agree that R.C. was not self-supporting. Consequently, the Court finds that this factor weighs in favor of R.C. being a resident of J.C.'s household.

### 7. Whether a new residence has been established

Under the seventh *Friedman* factor, the Court considers whether the child has established a new residence.[47] As noted above, J.C. and S.P. shared joint custody over R.C. and R.C. was seven years old at the time of the incident at issue. R.C. argues that because he lived with S.P. on a regular and permanent basis that he had established a new residence at her house. However, this argument ignores the joint custody agreement, the parenting plan, and the Kansas case law that a child may be a resident of multiple households.[48] J.C. and S.P. provided for R.C. in accordance with the parenting plan. Additionally, it is highly unlikely that R.C. could establish a new residence outside of the parenting plan due to his young age and medical needs. Therefore, the Court finds that the seventh *Friedman* factor weighs in favor of R.C. being a resident of J.C.'s household.

### 8. Where the child votes, gets mail, pays taxes, registers vehicles, banks, and has permanent ties

The eighth *Friedman* factor looks to where the child votes, gets mail, pays taxes, registers vehicles, banks, and has permanent ties.[49] The parties agree that due to R.C.'s young age he was

---

[46] *Id.*

[47] *Id.*

[48] *Hall*, 253 P.3d at 382.

[49] *Friedman*, 729 P.2d at 1166.

not able to participate in the activities that this factor analyzes. As a result, the Court finds that this factor is neutral and weighs in neither party's favor.

> 9.    *The length of time the child has actually resided in the home and the permanency of the living arrangements*

The Court considers the length of time that R.C. actually resided in J.C.'s home and the permanency of the living arrangements under the ninth *Friedman* factor. The Court already detailed the joint custody agreement and parenting plan above. R.C. again argues that this factor weighs against residency because he lived with his mother on a regular and permanent basis and his visits with J.C. occurred occasionally. The Court is unpersuaded by this argument. During the relevant time period, J.C. and S.P. shared joint custody over R.C. in accordance with the parenting plan. Thus, R.C.'s living arrangements with each parent was relatively permanent. Further, a child may be a resident of multiple households.[50] Accordingly, the Court finds that the ninth *Friedman* factor weighs in favor of R.C. being a resident of J.C.'s household.

Of the nine *Friedman* factors, factors one and eight are neutral to the analysis; and factors two, three, four, five, six, seven, and nine weigh in favor of residency. Thus, over two-thirds of the *Friedman* factors weigh in favor of R.C. being a resident of J.C.'s household. Therefore, the Court finds that R.C. was a resident of J.C.'s household during the relevant time period. Consequently, R.C. qualifies as an insured under the insurance policy, and thus, the insurance policy exclusion applies to R.C. As a result, the Court denies R.C.'s Motion and grants Travelers' Motion.

**IT IS THEREFORE ORDERED** that Garnishee Travelers Personal Insurance Company's Motion for Summary Judgment (Doc. 27) is **GRANTED**.

---

[50] *Hall*, 253 P.3d at 382.

**IT IS FURTHER ORDERED** that Plaintiff R.C.'s Motion for Summary Judgment (Doc. 25) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff R.C.'s request for oral argument is **DENIED** as moot.

**IT IS SO ORDERED.**

Dated this 10th day of June, 2024.

This case is closed.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE